# EMERSON *v.* RILEY.

---

EVIDENCE; WITNESSES; PATENTS; INTERFERENCE; ORIGINALITY.

1. The surrounding circumstances and the inherent probability or improbability of testimony in a case presenting a sharp issue of fact must necessarily have a material bearing on the outcome. (Citing *Beals* v. *Finkenbiner,* 12 App. D. C. 23.)

2. The entire testimony of a witness who is clearly shown to have testified falsely on a certain point is entitled to little consideration, for the courts are bound by principles of law, morality, and justice to apply the maxim, *Falsus in uno, falsus in omnibus,* which is founded on the theory, not that a witness who has wilfully perjured himself is incapable of speaking the truth as to other facts, but rather that the motive that prompted him to commit perjury in one part of his testimony may lead him to support it by falsifying other parts. (Citing *Alexander* v. *Blackman,* 26 App. D. C. 541.)

3. Priority of invention will be awarded parties in interference whose application was preceded by that of the adverse party who at the time of conception was employed as a draftsman under them, where it appears that he had only a theoretical knowledge of the issue, whereas they had a practical knowledge and special skill in the art, and their testimony, corroborated in most respects, shows their conception and subsequent disclosure to him with directions that he make a drawing, and the testimony of the witnesses in his behalf is vague and uncertain, and his own entire testimony, calculated to show prior conception by him, is unreliable by reason of the fact that he is shown to have testified falsely in at least one particular.

No. 863.   Patent Appeal.   Submitted January 12, 1914. Decided February 2, 1914.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.          *Reversed.*

The COURT in the opinion stated the facts as follows:

This appeal is from a decision of the Commissioner of Patents in an interference proceeding awarding priority of invention to the appellee, Willis L. Riley. It is one of two interferences involving closely related subject-matter. By stipulation the testimony taken in each, so far as material, is made applicable to the other. The application of George H. Emerson and Henry Yoerg, in the present interference, was filed January 20, 1909; that of Riley January 11, 1909.

The invention here involved relates to a superheater for locomotive engines, consisting of a header arranged in the smoke-

box of the locomotive, and connected at its ends with the steam-supply pipe and the cylinder steam chest. The interior of the header, by means of a longitudinal partition, is divided into separate compartments,—one for the saturated and the other for the superheated steam. Bosses are provided on the sides of the header, which in turn are divided into compartments connecting respectively with the saturated and superheated steam chambers of the header. The superheating pipes are arranged at the side of the header and extend into enlarged fire flues, the opposite ends of the pipes being connected with alternate compartments of the bosses. This invention, to distinguish it from that involved in the companion interference, is known as the "continuous boss" type, and is defined in fifteen counts. We here reproduce the 1st, 4th, 8th, and 13th as typical:

"1. A superheater for steam boilers, comprising a header having a longitudinal partition dividing said header into separate saturated and superheated steam chambers, and a longitudinally extending boss at the side of said header adjoining an end of said partition, said boss being divided into compartments, alternate ones of said compartments communicating with said saturated and superheated steam chambers."

"4. A boiler containing two curved rows of enlarged fire flues arranged about a central group of small flues, in combination with a curved header arranged in front of and substantially between said rows of enlarged flues, having a substantially central longitudinal partition dividing said header into separate saturated and superheated steam compartments, longitudinally extending bosses at the sides of said header adjoining the ends of said partition, said bosses being divided into compartments communicating with said saturated and superheated steam chambers and superheating pipes occupying said enlarged fire flues, and having their opposite ends connected respectively with said alternate chambers."

"8. The combination, with a boiler flue sheet and flues and a saturated steam-supply pipe, of superheater headers arranged one on each side of the longitudinal axis of the boiler and near said flue sheet, the upper ends of said headers having a con-

nection with said steam-supply pipe, and the lower ends of said headers having connections with the cylinder steam chests, each header comprising an elongated casting having a compartment for saturated steam and a compartment for superheated steam, the former communicating with said steam-supply pipe and the latter with the connections leading to the steam chests, superheating tubes arranged in groups on each side of said headers, the tubes of each group being located one above another and each tube in a group having its ends connected respectively with said steam chambers."

"13. A superheater comprising a header having longitudinally arranged saturated and superheated steam chambers therein and a series of bosses or lugs projecting from the walls of said chambers on each side of said header, said bosses having sockets therein communicating with said chambers respectively, the bosses communicating with a chamber on a side of said header being staggered with respect to the bosses communicating with the other chamber on the same side, whereby all of the bosses on the same side will be exposed and accessible from the front of the header, and superheater tubes communicating with said chambers on each side of said header through said sockets."

The Examiner of Interferences observed that the question involved is one of originality rather than of priority of invention, and, after a painstaking review of the evidence, determined that question in favor of Emerson and Yoerg. The Examiners in Chief, two members sitting, reversed this finding and award, which decision was sustained by one of the Assistant Commissioners.

At the time this controversy arose, late in December, 1909, Mr. Emerson was assistant general manager of the Great Northern Railroad, which position he had held for about seven months. He has since become general manager of that road. He had been continuously employed by that company since 1882, and, for eight years prior to his promotion to the position of assistant general manager, he had been superintendent of motive power. In that position he had entire supervision of locomotive engines for the company, and, consequently, the duty de-

volved upon him to evolve or adopt improvements for such engines. Mr. Yoerg, coapplicant, a graduate of the Massachusetts Institute of Technology, was and is the mechanical engineer of the same company. His first connection therewith was in 1897, when he was employed as a draftsman. Subsequently he became superintendent of shops at Havre, Montana, where he remained about a year. He was then made superintendent of the St. Paul shops, where he remained until November 15, 1908, when he was promoted to the position he now holds. Like Mr. Emerson, he had a thorough and practical knowledge of locomotive engines.

Mr. Riley was about twenty-eight years old when this controversy arose, and had been employed by the Great Northern Railroad since October, 1902, as a draftsman. In September, 1907, he was promoted to be chief draftsman. While, of course, he was a highly skilled draftsman, the evidence shows that he had had no practical experience in building or using superheaters. In fact, he had never seen a superheater in actual use, although he must have been familiar with the mechanical construction of such devices.

According to the evidence for Emerson and Yoerg, their company had experienced more or less difficulty with the type of superheaters then in use. Mr. Emerson, Mr. Yoerg, and a Mr. Robert D. Hawkins, who was then assistant superintendent of motive power on the Great Northern, and has since been promoted to be superintendent of motive power, met at the offices of the company in St. Paul on a Sunday in the latter part of December, 1908, for the purpose of making up a budget of improvements for the year 1909. Mr. Hawkins could not testify positively upon what particular Sunday in December this occurred, but was of the opinion that it was prior to Christmas, for the reason that such work is not usually taken up between the holidays. Mr. Emerson states positively that this occurrence was on the 20th of December, 1908, and his reason for being so positive is that he was then preparing recommendations for the 1909 improvements, and, early in the month, had written to his subordinates to submit their recommendations; that his

manager, about the 16th or 17th of December, advised him that it would be necessary to submit the recommendations to the executive officers about the first of the year; that on Saturday, the 19th, he advised Mr. Yoerg that he wished to go over the recommendations the next day; that he remembers distinctly that he was unable to complete his recommendations from the fact that he had not received a full report from the car department. By reference to his files he found that he received a reply from that department on the 23d. He therefore did not have that reply before him on the 20th, as he would have had if the meeting had taken place on the 27th. Mr. Yoerg was certain that it was the 20th of December, for the reason that it was the first Sunday since his appointment as mechanical engineer, November 15, 1908, that he had been required to work. These gentlemen on that Sunday lunched at Carlings *café*. During lunch time, according to their testimony, they were discussing superheaters, when Mr. Emerson suggested the idea of "an arrangement where it could be possible to remove one element without disturbing the other." Mr. Yoerg "made a suggestion in reference to casting the boss to the header in order to overcome the trouble that we had experienced with the other pipe that was secured with a bolt, and the joint made with a gasket." Mr. Hawkins testifies that "Mr. Emerson suggested at that time that there were too many joints in the Schmidt and Toltz arrangements, and he asked Mr. Yoerg why a design of a superheater could not be gotten up, doing away with the header proper and making the steam pipe itself act as a header. He and Mr. Yoerg discussed a design of that kind, and Mr. Yoerg outlined the method of attaching the pipes.   *   *   *   Mr. Emerson suggested using the steam pipe as a header, and Mr. Yoerg suggested means of attaching the superheating pipes." Rough sketches were made, either on the tablecloth or on a strip of paper, but no sketch was preserved. It was determined by Mr. Emerson, however, according to the testimony of these witnesses, to have these ideas worked up next day, which was Monday, December 21, 1908.

According to Mr. Yoerg's testimony, he saw Mr. Riley, the

appellee, the next morning, December 21st, explained the ideas evolved by Mr. Emerson and himself the day before, and directed him to start the work of laying out the new superheater. It may be pertinent here to state that Mr. Emerson was Mr. Yoerg's superior, and Mr. Riley was subordinate to both Mr. Emerson and Mr. Yoerg, and subject to their directions. Mr. Riley, Mr. Yoerg testifies, stated that he would get Mr. Ross, another draftsman, to draw the flue sheets that the matter might be expedited, and this was done. Mr. Nicoll, a mechanical draftsman employed by the Great Northern, testifies that early Monday morning, December 21, 1908, he saw Mr. Yoerg and Mr. Riley in conversation in the drafting room, and that soon thereafter he learned that a new superheater was being designed. He remembers distinctly that this was on the Monday before Christmas. Mr. Nicoll, during the making of the first tracing by Mr. Riley, "noticed Mr. Yoerg frequently at Mr. Riley's desk. * * * They were together a great deal during that Monday and for several days during the same week." Mr. Nicoll remembers that on the day the tracing was finished "Mr. Riley had it on the desk next to mine covered up with a sheet of drawing paper, and told me he had worked on it,—he says, 'I took it home last night and worked until 11 o'clock on it to get it finished.'" Later in the day Mr. Yoerg came in and looked at the tracing. Mr. Ross testifies that by the direction of Mr. Riley he laid out a couple of tracings of flue sheets for him before the final drawing for the new superheater was commenced, and Mr. Nicoll corroborates this testimony. Mr. Yoerg testifies that this tracing was made under his supervision and that of Mr. Emerson, with whom he consulted and who also frequently saw it as it was taking form; that on Saturday morning, January 2d, Mr. Yoerg asked Mr. Riley to bring the tracing down to his, Yoerg's office. Upon Mr. Riley's statement that the tracing was at his home he was requested to get it, which he did, and that Mr. Yoerg then discovered that Mr. Riley had placed his name on the tracing as the inventor. Thereupon Mr. Yoerg, according to his testimony, asked Mr. Riley whether he had ever thought of the idea before it was explained to him by Mr. Yoerg

on the 21st of December, 1908; that Mr. Riley stated he had not, and he thereupon was directed to erase his name from the tracing, which he did; that later in the day Mr. Riley again brought the tracing to the office of Mr. Yoerg, when Mr. Emerson was present. Mr. Emerson testifies that Mr. Riley then stated that there was some misunderstanding with reference to this superheater; that Mr. Emerson then asked him whether he had any idea of this particular design before he was instructed to make it up. "He said not, but he had made the drawing. I then advised him that that was his business to make drawings; that is what he was hired for." This tracing is dated December 31, 1908. From it blue prints were made, and one of these blue prints (Emerson and Yoerg Exhibit No. 1) was immediately taken to patent solicitors for the purpose of having an application filed for Emerson and Yoerg. The original was kept in Mr. Yoerg's desk, which was broken open and the tracing taken therefrom. It subsequently turned up in the possession of Mr. Riley.

There is another item of evidence tending to show that the discussion at Carlings *café* occurred on the 20th of December, instead of the 27th, as contended in behalf of Mr. Riley. A Mr. Adolph J. Anderson, a draftsman who was not in the employ of the Great Northern when he testified, and who therefore was an entirely disinterested witness, had previously been employed by the company, and a second period of employment commenced on Monday morning, December 28, 1908. Mr. Riley's table, the witness stated, was immediately in front of his, and he noticed that there was a piece of drawing paper on that table about 4 feet long and 2½ feet wide. At noon Mr. Emerson and Mr. Yoerg came into the room and walked over to Mr. Riley's table and there consulted with him. Mr. Riley, when Mr. Emerson and Mr. Yoerg reached his table, took the thumb tacks out of the paper covering the drawing paper underneath, and the witness gathered enough of the conversation to know that they were discussing a superheater. The fact that the discussion was apparently secret, and that it was the first time the witness had seen Mr. Emerson in the office, led him to pay

particular attention to the conversation. Of course, if the testimony of Mr. Anderson is true, and there is every reason to believe that it is, the incident at Carlings *café* necessarily occurred on the 20th of December, rather than on the 27th, for otherwise there would have been no drawing to discuss on the 28th.

Immediately after the tracing or drawing of the subject-matter of this interference was completed, certain practical and technical defects were discovered in the structure there disclosed. Thereupon the subject-matter of the second interference was conceived and disclosed by Emerson and Yoerg. They directed Mr. Ross, to whom reference already has been made, to prepare a drawing embodying their conception, and his drawing was completed February 10, 1909. There is no claim by Mr. Riley that any information concerning this invention was furnished by him to either Emerson or Yoerg or to the draftsman, Mr. Ross. In other words, so far as this record discloses, Emerson and Yoerg were independent inventors of the subject-matter of the second interference.

The principal difference between the construction of the second superheater and the first is explained thus by Mr. Emerson: "The general construction of the header as shown on the first exhibit of December 31, 1908, the construction was such that it was our opinion that it would be so rigid that it would be impossible to keep the top and bottom joints tight due to its expansion and contraction. It was also heavier than was necessary due to its construction. It (the new construction) is much lighter, and there is a difference in the construction of the bosses." As explained by Mr. Yoerg, "the purpose of making that drawing was, after talking the matter over with Mr. Emerson we concluded to put on the bosses in place of the other casting, due to the considerable amount of material in the first header, which would serve to make a great amount of contraction and expansion. Also on account of difficulty in making a casting.". Patterns for the superheater disclosed in this second drawing were started the 1st of March and a superheater was completed and installed in an engine in July, 1909. Other

superheaters were also constructed and installed at a later period.

We will now review the evidence in behalf of Mr. Riley. He testifies that in the latter part of *December, 1906,* he "had formulated a general idea of the superheater' referred to (the superheater of this interference), and made some rough sketches;" that on or about February 6, 1907, he made sketches showing the superheaters of both interferences in his sketch book, which book he produced. These sketches or drawings, for they are much more than mere sketches, covered several pages of this book and purport to have been made on the 15th of January, 1907. Mr. Riley says that this was the day he conceived "the general idea of the superheaters shown on these pages." Mr. Riley further testifies that prior to December 20, 1908, he showed these drawings to his wife, to Mr. Thomas Crawford, to Mr. Thomas Riley, his father, and to a Mr. Frank Whealon. He produced a sketch which he said he made for Mr. Whealon on the cover of the April, 1907, issue of the Locomotive Engineers Journal and also sketches on a postal card at the same time. These sketches, he testifies, were left with Mr. Whealon after they were made by him, and were found in Mr. Whealon's attic on October 23, 1910. He further testifies that in April, 1908, he discussed the subject-matter of this interference with Mr. Whealon at St. Joseph's Hospital and again on November 8, 1908, when Mr. and Mrs. Whealon called at his home; that on November 22, 1908, he commenced a small tracing of the superheater of this issue, which tracing, according to his testimony, was completed in a few days; that he then "did practically nothing until the night of December 23, 1908," at which time he added a few dimensions to his tracing and some figures showing the number of tubes lost by applying the superheater to an ordinary locomotive. Prior to this time he admits that he had never mentioned the matter to either Emerson or Yoerg. He says, however, that he finally decided, on November 23d, "to take the tracing down to the office and show them (Emerson and Yoerg) the device, with a view of probably introducing it on the Great Northern Railroad." On cross-ex-

amination he was asked whether there were any particular circumstances which led him to determine then to disclose his invention. He replied: "I don't remember of anything in particular." Mr. Riley says he took the tracing down to the Great Northern offices on December 23d and showed it to Mr. Nicoll and Mr. Ross. Both Mr. Nicoll and Mr. Ross positively deny this, and both state that the large tracing of December 31st was the first tracing they ever saw of the invention. Mr. Riley says that within half an hour after showing his small sketch to Mr. Nicoll and Mr. Ross, Mr. Yoerg came into the drafting room, and, after looking at it, remarked, "that is all right;" that he thereupon asked permission to show it to Mr. Emerson, which was done; that Mr. Yoerg came back to the drafting room and asked him, Riley, whether he could figure the heating surfaces; that thereupon Mr. Riley pushed a scratch pad over to Mr. Yoerg, and the heating surfaces were figured out. Mr. Riley produced in evidence three sheets of yellow scratch paper, the figures upon which admittedly having been made by Mr. Yoerg. Mr. Emerson and Mr. Yoerg also deny ever having seen this small sketch to which Mr. Riley alluded. Mr. Riley further says that on the 24th he was called to Mr. Emerson's office, where he found Mr. Emerson and Mr. Yoerg in conversation, comparing his design with two other superheaters; that he then told them that he wanted all the benefits of this superheater outside the Great Northern Company, and that he was assured that his interests would be protected; that Mr. Emerson then said, "You had better work it all out, and we will have the patterns made and put it on an engine;" that Mr. Yoerg said: "Yes, you work out all the details;" that he suggested that this tracing was on too small a scale; that Mr. Yoerg agreed to this and instructed him to "work it to a larger scale;" that he did nothing on the larger drawing until the evening of December 28th. It may be noted here that this is in direct conflict with the testimony of the witness Anderson, who saw the large tracing during the forenoon of that day. The testimony of Mr. Nicoll and Mr. Ross also tends to show that work on the large

tracing commenced considerably earlier than the time fixed by Mr. Riley.

On New Years night, Mr. Riley states, he took the tracing home and left it there; that during the afternoon of January 2d Mr. Yoerg came into the drafting room and asked for it; that he immediately procured it and left it on Mr. Yoerg's table; that a little later Mr. Yoerg requested to see him; that he thereupon went to Mr. Yoerg's office, where the tracing was spread out on the desk; that Mr. Yoerg "wanted to know if I didn't think it was a little farfetched. I asked him what he meant. He said, 'This,' pointing to my name;" that, after a serious argument, Mr. Yoerg ordered his name off; that he finally took the tracing to the drafting room and removed his name. The witness was asked on cross-examination what Mr. Emerson said when he was informed by the witness of the dispute as to who was the inventor, and replied: "I called Mr. Emerson's attention to the fact that Mr. Yoerg had disputed me on the invention, and he jumped up from his chair and exclaimed that he didn't give a damn whose name was on that tracing; that that was what they had draftsmen there for, was to work up *his* ideas." The Riley application was filed almost immediately thereafter, its date, as previously noted, being January 11, 1909. While Mr. Riley remained with the Great Northern Company until January, 1910, he did not disclose the fact of his application to any official of that company, nor did they know of it.

The drawing embodying the structure of the second interference was in the drafting room, easily accessible to Mr. Riley. There is direct testimony to the effect that he saw this drawing while it was being made. This he denies, and, in denying it, is unquestionably testifying falsely. He swears positively that he did not go near the office at all from about a week or ten days after his conversation with Emerson and Yoerg on said January 2d until about the middle of February. It will be remembered that the drawing for the second invention was completed on February 10th. Evidently Mr. Riley was unwilling to admit that he was on duty while that drawing

was being made. The evidence is overwhelming, however, that he was there practically every day during that time. Having stated that he was so disgusted that he remained away, he was asked in cross-examination whether he was too disgusted to accept his salary for the time of his absence, and replied: "Not at all. Everything I got was coming to me. Q. You were willing to take all you could get? A. All I could get. It was the practice down there to help yourself."

As previously stated, several of the witnesses to whom Mr. Riley said he disclosed the invention of the present interference prior to December 20, 1908, deny such disclosure. Mr. Whealon, a locomotive engineer and a close friend of Mr. Riley, identified the copy of the Locomotive Engineers Journal and the postal card to which Mr. Riley referred in his testimony, and testified as to when the sketches were made thereon and also as to the finding of the exhibits later. The witness also testified that he saw the book containing the drawings to which reference has been made about the 18th of December, 1908, and remembered having seen the drawings therein. Mrs. Whealon testified to the finding of the magazine and postal card on August 23, 1910. How long they had been in the attic she was unable to state. The testimony of Mrs. Riley is equally vague. The father of Mr. Riley, Mr. Thomas Riley, was called, and while he was unable to say that he had seen the sketch book in 1907 he was certain that he saw it in the latter part of November, 1908, and that his son then informed him that he was drawing a superheater. A careful examination of Mr. Thomas Riley's testimony, however, fails to convince us that he saw the drawings in this sketch book relating to this invention prior to the latter part of December, 1908. That he saw drawings may readily be conceded, but, having no technical knowledge, it was very difficult for him to distinguish one from another.

The appellee, having testified in his direct examination that he had exhibited this sketch book and disclosed the invention to Mr. Thomas Crawford, he was asked in cross-examination, about the middle of February, 1911, whether he intended to call Mr. Crawford, and replied: "I can't say just now whether that is

the intention or not." He was then asked whether he had requested Mr. Crawford to come and testify, and replied that he had not. Mr. Crawford was not called by Mr. Riley in making out his case in chief. He was called in rebuttal, however, and it then transpired that Mr. Riley, sometime prior to January 20, 1911, had written Mr. Crawford and submitted a list of questions for him to answer, and that Mr. Crawford, under date of January 20, 1911, had replied, saying, among other things: "I think you have a good case and hope you sting them hard. If you have to have my testimony I will either make it before a notary here or come East." As his reason for not calling Mr. Crawford in making out his case in chief, Mr. Riley stated that he could not afford to expend the $225 it would have cost to call him earlier. When the testimony was taken, notice was given that a motion would be made to suppress it, which motion was made, and the Examiner of Interferences suppressed the testimony. This decision was sustained by each of the other tribunals. Mr. Crawford, who was formerly a mechanical engineer, was a salesman at the time he testified. He stated that he was employed by the Great Northern company from March 1, 1906, until December 31, 1907, and that he saw the Riley sketch book "practically every day while I was at the office;" that he saw a sketch of the present invention, and that it was explained to him by Riley "in a general way," and that he "understood the general idea;" that he had not seen the book from the middle of December, 1908, until he testified on June 13, 1911. He was asked in direct examination whether any of the drawings in the sketch book which were shown him prior to his leaving in December, 1908, 'show an individual or outside boss on a superheater," and replied: "Well, the sketches show both types of bosses, although I didn't know them by that name when we discussed them. He simply had various ideas as to what would be the best arrangement if such a device was used."

*Mr. William A. Redding, Mr. A. C. Paul,* and *Mr. Richard Paul* for the appellants.

*Mr. Frederick G. Bradbury* and *Mr. John E. Stryker* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

Since there is such a sharp issue of fact in this case, it is apparent that the surrounding circumstances and the inherent probability or improbability of the testimony must have a material bearing upon the outcome. *Beals* v. *Finkenbiner,* 12 App. D. C. 23. And where it clearly appears that a witness has wilfully testified falsely as to a given point, his entire testimony is entitled to little consideration, for "courts are bound by principles of law, morality, and justice, to apply the maxim, *Falsus in uno, falsus in omnibus.*" *Alexander* v. *Blackman,* 26 App. D. C. 541; *Campbell* v. *State,* 3 Kan. 498; *Dell* v. *Oppenheimer,* 9 Neb. 457, 4 N. W. 51; *Stoffer* v. *State,* 15 Ohio St. 56, 86 Am. Dec. 470. The theory upon which this rule is founded is not that a witness who has wilfully perjured himself is incapable of speaking the truth as to other facts, but rather that the motive that prompted him to commit perjury in one part of his testimony *may* lead him to support it by falsifying other parts. In other words, courts have found it unsafe to base an award upon the testimony of such a witness.

In the present case we have two men of high character, occupying positions of trust and responsibility, and possessing special skill in the art to which this invention relates. To deny their claim to the invention we must find that they deliberately entered into a conspiracy to deprive their subordinate, Mr. Riley, of the fruits of his genius. There is no half-way ground, for deliberate perjury rests on one side or the other. That Mr. Riley has testified falsely in one material respect is overwhelmingly established; for, instead of being absent from his duties for over a month at the time the drawings for the invention forming the subject-matter of the second interference were being prepared, he was there practically every day. While there is less direct evidence that he saw these drawings than as to his being present during the time of their preparation, we think he

is clearly discredited as to this point. In other words, we entertain no doubt whatever that he saw these drawings while they were in process of evolution. We must, therefore, scrutinize all of his testimony with great care.

We think the evidence of Emerson and Yoerg satisfactorily shows that the conversation at Carlings *café* occurred on Sunday, December 20, 1908, and that the general features of the invention of this interference were there disclosed. Admittedly, Mr. Riley had not then disclosed any part of the invention to them or either of them. That an interview took place between Mr. Yoerg and Mr. Riley on the next morning even Mr. Riley himself admits. Both the evidence and circumstances tend to show that Mr. Yoerg then disclosed the general features of the invention to Mr. Riley, and directed him to work out the details on paper. This it was Mr. Riley's duty to do. Mr. Riley's testimony at this point is very improbable, and, to our minds, unbelievable. He says he then had in his possession the small tracing (his Exhibit D), and that for some unexplained reason he took this tracing to the office on the 23d, and showed it to both Mr. Emerson and Mr. Yoerg. He does not explain why, if the elaborate drawings in his sketch book which completely covered both the invention of this and of the companion interference were then in existence, he made no mention whatever of them. He does say that previously he had withheld information from Emerson and Yoerg because of his fear that they would appropriate his invention. Just why there was less danger of their appropriating it if disclosed by means of the small tracing than there would have been had he disclosed it by means of his sketch-book drawings, he does not explain. Nor does he explain, or attempt to explain, why he did not show or make known this sketch book to his own counsel when this application was being prepared.

Mr. Riley attempts to explain his failure to include the subject-matter of the second interference in his first application, by the statement that he supposed the first application was sufficiently broad to cover both forms. But it is very significant that this draftsman, whose knowledge of superheaters was the-

oretical, and not practical, should have originally devised both forms of the invention. It will be borne in mind how the second form came to be devised by Emerson and Yoerg. Mr. Riley has attempted to prove too much. It is unbelievable that back in January, 1907, he conceived both forms of this invention and in February of that year, on a single day or within two or three days at most, according to his own testimony, made the elaborate drawings in his sketch book covering both forms. We are convinced that the drawings of the invention of this and of the companion interference in this sketch book were not made until a time subsequent to the disclosure of Emerson and Yoerg.

The testimony of the witness Whealon we are unable to accept. The other witnesses for Mr. Riley, with the possible exception of Mr. Crawford, to whom we shall presently refer, would hardly have distinguished one drawing from another, and their testimony, therefore, is of little importance here. That the testimony of Mr. Crawford might have been seasonably obtained is apparent, we think, and we therefore are not prepared to say that the Patent Office tribunals erred in suppressing it. It may be suggested, however, that even if that testimony should be considered it would not change the result. That Mr. Crawford was a partisan of Mr. Riley's is apparent. He left the employ of the Great Northern road December 31, 1907, and his testimony was given June 13, 1911. In view of the fact that the drafting room was the place where drawings for the various parts of locomotive engines were made, and that various types of superheaters were developed, it is not strange that this witness should have had some conversation with Mr. Riley on the subject of superheaters. The testimony of the witness, however, is altogether too vague to convince us that Mr. Riley then disclosed to him this invention. Nor do we think the witness ever saw the drawings covering this invention in the Riley sketch book at the time he testifies he did.

An attempt has been made to discredit Mr. Yoerg in connection with the calculation of heating surfaces which he made on the yellow slips of paper introduced by Mr. Riley as exhibits. It is contended that these calculations were, made with ref-

erence to Riley's Exhibit D. Mr. Yoerg testifies that they were made in January, while he was developing the second form of superheater, and that they were preliminary in character. Mr. Ross, the draftsman, remembers that calculations were made and that they were made on similar paper. Of course, he could not definitely identify these particular sheets. Moreover, it is possible that these calculations were made by Mr. Yoerg with reference to the large tracing of December 31st and either while that tracing was under way or at its completion. Admittedly this shows substantially the same structure that is shown in the small Riley Exhibit D tracing. In view of the fact that the calculations were preliminary in character, and that the sheets of paper upon which they were made were cast aside by Mr. Yoerg, we do not think it would have been at all strange had he been mistaken in his testimony as to just when the calculations were made. At all events, since Mr. Riley has been so badly discredited as to this Exhibit D and otherwise, we accept Mr. Yoerg's statement that he did not see that Exhibit.

On the whole case, we are clearly of the opinion that the award of priority should have been in favor of Emerson and Yoerg. The decision of the Commissioner will therefore be reversed.                                               *Reversed.*